**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
**UNITED STATES OF AMERICA**

     -against-

**HECTOR PADILLA,**

                        **Defendant.**
-------------------------------------------------------------------x

**REPORT AND RECOMMENDATION**

**06-CR-824 (NGG)**

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

     Defendant Hector Padilla ("defendant") moves to suppress a handgun that he was found to be carrying in violation of 18 U.S.C. § 922(g)(1), which, among other things, makes it a crime for a felon to possess a firearm that has moved in interstate commerce. Following a referral by the Honorable Nicholas G. Garaufis, this Court held an evidentiary hearing on February 2, 2007, at which the sole witness was Brendan O'Brien, the police detective who stopped defendant and recovered the weapon. Having found his testimony to be wholly credible, this Court recommends that defendant's motion be denied, for the reasons discussed below.

## FACTUAL BACKGROUND

     On October 27, 2006, Brendan O'Brien, a detective with nine years in the New York City Police Department ("N.Y.P.D."), was sitting with his partner in an unmarked police car observing an apartment building that he had reason to believe was being used in the sale of narcotics. See Transcript of Suppression Hearing dated February 2, 2007 ("Tr."), at 3–5. The apartment building was located near the intersection of Boyd and Cedar streets in the Stapleton section of Staten Island, a neighborhood known for its high rate of shootings and drug- and gun-related arrests. See id. at 4–5. At approximately 8:15 p.m., Det. O'Brien

noticed a "skinny, white male" walking along Boyd Street in the direction of the apartment building. See id. at 6. Based on the man's disheveled appearance, the detective thought he might be a drug user on his way to the surveilled building to buy narcotics. See id.

Nevertheless, rather than turning left on Cedar Street toward the apartment building, the skinny man walked past the detectives, continued straight on Boyd Street, and crossed Cedar toward a wooded pathway where Boyd ends. See id. at 7. At this point, Det. O'Brien noticed two other men about twenty feet behind the first man, walking single file along Boyd Street in the same direction. See id. at 6–7. It appeared to Det. O'Brien that the two men were together and that they were following the skinny man. See id. at 7. Additionally, from the manner in which they were walking -- seemingly attempting to remain directly behind the skinny man so as to avoid his peripheral vision -- Det. O'Brien inferred that they were attempting to prevent the first man from seeing them. See id. at 15–16. The two followers continued across Cedar Street, staying behind the skinny man and heading toward the same wooded area. See id. at 8. The street was otherwise deserted, and Det. O'Brien found it "odd" that in that neighborhood, after dark, the only people on the street would choose to walk along a relatively isolated, unlit path, rather than stay on the lighted sidewalks. See id. at 15, 17. The detective suspected that the two men in the rear were planning to rob the skinny man, or perhaps that the three men were preparing to meet to engage in a drug transaction. See id. at 8.[1]

---

[1] On cross-examination, Det. O'Brien described defendant Padilla (one of the two men in the rear) as a light-skinned Hispanic and described the third man as black, but denied that the

(continued…)

His suspicions thus aroused, Det. O'Brien and his partner drove around the block in order to observe the three men when they emerged from the other end of the path. See id. It took the officers approximately thirty seconds to circle the block, where, from about fifty feet away, they saw the three men exiting the wooded area, now apparently walking together as a group. See id. at 9, 19–20. At this point, Det. O'Brien observed one of the men -- identified in court as defendant Hector Padilla (id. at 13) -- reach under his jacket and sweatshirt and make a motion that, in the detective's experience, looked as if defendant were adjusting a firearm tucked into his waistband. See id. at 9–11, 24. The detectives drove toward the men, still believing that a drug deal or robbery might be imminent, or that a drug transaction might already have occurred. See id. at 21–23. Det. O'Brien stopped his car in front of the group and, without drawing his gun, ordered the men to put their hands on the side of the vehicle. See id. at 11, 31–34. After patting down defendant and feeling a hard object shaped like a handgun in defendant's waistband, Det. O'Brien reached under defendant's jacket and retrieved a loaded .38 caliber Smith & Wesson revolver. See id. at 12–13, 35.

Defendant was subsequently charged with violating 18 U.S.C. § 922(g)(1), having previously been convicted for a drug felony offense. See Complaint and Affidavit in Support of Application for Arrest Warrant dated October 31, 2006, at ¶ 7. Defendant moved to suppress the gun seized from him, contending that Det. O'Brien lacked reasonable suspicion to stop and frisk him. See Letter to the Court from Peter Kirchheimer dated January 25, 2007

---

[1](...continued)
"racial distinctions among the group" had added to his suspicions. Tr. at 18, 24.

("Def. Mem."). The government opposed the motion, arguing that the totality of the circumstances justified the investigative detention and limited search for weapons authorized under Terry v. Ohio, 392 U.S. 1 (1968). See Government's Memorandum of Law in Opposition to the Defendant's Motion to Suppress dated January 30, 2007 ("Govt. Mem.").

## APPLICABLE LAW

The Second Circuit has summarized the three basic levels of interaction between law enforcement officers and members of the general public: consensual encounters, investigative detentions, and arrests. See United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995). Each type of interaction must conform with certain limitations imposed by the Fourth Amendment's protection against unreasonable searches and seizures. For example, police officers require no justification to initiate a consensual encounter with a private citizen, as long a reasonable person in those circumstances would understand that he or she was under no obligation to cooperate and was free to terminate the encounter at any time. See United States v. Stone, 73 F.Supp.2d 441, 445 (S.D.N.Y. 1999). In contrast, in order to subject an individual to an investigative detention or limited seizure, an officer must have "reasonable suspicion" that criminal activity has just occurred or is imminent. See Tehrani, 49 F.3d at 58. Finally, an arrest requires a showing of probable cause. See id.

It is undisputed that the encounter in this case constituted a limited seizure or "*Terry* stop," named for the Supreme Court's landmark decision in Terry v. Ohio, 392 U.S. 1. See Tr. at 47, 54. Consistent with Terry, a police officer "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts

4

that criminal activity 'may be afoot' even if the officer lacks probable cause." United States v. Sokolow, 490 U.S. 1, 7 (1989) (citing Terry). An assessment of whether an officer's suspicion is reasonable and sufficiently supported by articulable facts requires an objective analysis of the "totality of the circumstances" surrounding the detention. See United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000).

In addition, if the officer reasonably suspects that a lawfully detained individual poses a threat to the safety of the officer or others nearby, the officer is permitted to conduct a limited protective search for weapons in the individual's possession. See Terry, 392 U.S. at 27, 29, 30; McCardle v. Haddad, 131 F.3d 43, 48 (2d Cir. 1997). Such a protective search ordinarily is limited to a patdown of the outside of a suspect's clothing, aimed solely at detecting a concealed weapon. See Terry, 392 U.S. at 30.

## DISCUSSION

### A. The Stop

Defendant contends that Det. O'Brien could not have had reasonable suspicion of criminal activity justifying a *Terry* stop, and that the Court must therefore suppress the gun recovered from defendant, as well as his post-arrest statements, as the fruits of an illegal search. See Def. Mem. at 1, 3. Specifically, defendant argues that the only articulable basis for his detention was defendant's gesture toward his waistband, and that such a gesture, without more, is insufficient justification for a *Terry* stop. See Def. Mem. at 3; Tr. at 51. The government concedes that Det. O'Brien subjected defendant to an investigative detention requiring reasonable suspicion, but argues that the information known to the detective satisfied

this requirement and that the stop and subsequent patdown were therefore lawful. See Govt. Mem. at 7–9; Tr. at 54–60.

If, as defendant asserts, the only factor supporting Det. O'Brien's suspicion was defendant's hand gesture, defendant's argument would have more force. See Stone, 73 F.Supp.2d at 446 ("[T]he suspected object in [defendant]'s pocket [does not] appear sufficient in and of [itself] to justify the stop . . . .") (dictum). However, as the government notes, see Tr. at 54–56, the record in this case reflects several additional factors that, considered together, establish that Det. O'Brien's suspicion was reasonable. Notably, the defense does not challenge the objective facts testified to by Det. O'Brien; the dispute concerns the reasonable inferences to be drawn from those facts. See Tr. at 46-47.[2]

   1.   **High-Crime Neighborhood**

Although "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," the fact that "the stop occurred in a high-crime area [is] among the relevant contextual considerations in a *Terry* analysis." Illinois v. Wardlow, 528 U.S. 119, 124 (2000). Here, Det. O'Brien gave credible, uncontradicted testimony that the area in which he detained defendant was a high-crime neighborhood, with a high incidence of drug- and gun-

---

[2] For example, the defense has not argued that Det. O'Brien fabricated his observation of defendant's gesture at his waistband. In any event, this Court found Det. O'Brien to be entirely forthright in his description of what transpired.

related violence,[3] thus supplying a factor supporting the reasonableness of the officer's suspicion.

   **2.     Time of Day**

It is also noteworthy that defendant's detention occurred after dark. In certain contexts, "sometimes innocuous factors such as the time of day . . . take on added significance." Bayless, 201 F.3d at 135 (finding the defendant's presence on the street at 5:00 a.m. to be among the factors justifying *Terry* stop); United States v. McPhatter, No. 03-CR-911 (FB), 2004 WL 350439, at *2 (E.D.N.Y. Feb. 24, 2004) ("[I]n light of all circumstances, including . . . the time of night [approximately 1 a.m.]," officer had reasonable suspicion justifying *Terry* stop); Burrell v. Lucas, Civ. No. 3:91-511 (JAC), 1992 WL 336763, at *4 (D. Conn. Oct. 14, 1992) (Cabranes, J.) (defendant's presence in the "'middle of the night' . . . in an area where thefts had recently been reported" was a factor establishing officer's reasonable suspicion for *Terry* stop).

Although the events in the case at bar did not transpire in the middle of the night, they did occur well after dark. Det. O'Brien testified that this was a factor in his suspicion that criminal activity was afoot, because it was unusual for people to travel after dark on the isolated, unlit path rather than stay on the lighted streets. See Tr. at 17. Consequently, the time of day was yet another articulable fact on which Det. O'Brien reasonably relied.

---

[3] The area was the site of the fatal shootings of two undercover N.Y.P.D. detectives in March 2003. See Tr. at 5.

### 3. Defendant's Suspicious Activity

Defendant's behavior likewise contributed to Det. O'Brien's suspicion. "[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot," he is entitled to conduct an investigative detention. See Terry, 392 U.S. at 30. Activity that is not overtly illegal, but that raises an officer's suspicion that a robbery may be imminent, can justify a *Terry* stop. See id. at 22 (defendant's "series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation," justified investigative detention based on officer's suspicion that men were planning to rob store); United States v. Rogers, No. 95 CR. 1136 (MBM), 1996 WL 422260, at *4 (S.D.N.Y. July 29, 1996) (suspects' actions, though not overtly illegal, were consistent with preparation to rob livery cab, justifying *Terry* stop).

Similarly, apparently benign behavior that nonetheless leads an officer to believe he is witnessing drug-related activity can provide justification for a *Terry* stop. See Bayless, 201 F.3d at 133 ("[T]he reasonable suspicion inquiry must ask if 'the conduct would appear suspect to one familiar with the practices of narcotics couriers, albeit the pattern of behavior is innocuous to the untrained observer.'") (citation omitted); United States v. Trullo, 809 F.2d 108, 112 (1st Cir. 1987) (sequence of events — in which driver let passenger into car in notorious drug zone, parked on a deserted side street, and conferred briefly with passenger, who then exited the vehicle and walked back in the direction from which he had come — supported officers' reasonable suspicion that they had witnessed an illegal transaction).

Here, Det. O'Brien testified that, based on his knowledge of the area, he found it

8

"odd" that the only people on the street at that time of evening were walking toward an unlit, wooded pathway beyond the end of a dead-end street. See Tr. at 17. Based on this, and on what he characterized as the deliberate manner in which defendant and his companion remained behind the skinny man, Det. O'Brien suspected he might be witnessing an incipient robbery or drug deal. See id. at 8. Significantly, however, rather than act immediately, Det. O'Brien continued to monitor the situation and saw nothing to allay his concerns. See id. at 8, 23–24. When he came upon the men again as they exited the wooded area, defendant and his companion had caught up to the first man, and the three were now walking in a group, see id. at 9 -- a turn of events that in no way undermined the officer's suspicions. Id. at 24.

"Perhaps none of these facts, standing alone, would give rise to a reasonable suspicion; but taken together as appraised by an experienced law enforcement officer," they do, at a minimum, provide the Court with an additional factor to weigh in its *Terry* analysis. See United States v. Alexander, 907 F.2d 269, 272 (2d Cir. 1990) (quotation marks, citation omitted).

### 4.     Defendant's Gesture

Finally, defendant's gesture toward his waistband was an additional factor that reasonably contributed to Det. O'Brien's belief that criminal activity was afoot. An officer's reasonable suspicion that an individual is armed — often based on a distinctive bulge beneath the individual's clothing — can support a *Terry* stop. See United States v. Henry, No. CR-90-0613 (CBA), 1990 WL 179739, at *4 (E.D.N.Y. Nov. 6, 1990) (bulge under defendant's sweater supported *Terry* stop); Stone, 73 F.Supp.2d at 446 (heavy object -- a possible gun --

observed swinging in suspect's coat pocket, "taken together" with other factors, "could suggest to a reasonable law enforcement officer that criminal activity was underway," justifying stop); Burrell, 1992 WL 336763, at *4 (bulge in the area of defendant's waistband supported *Terry* stop).

Similarly, an individual's hand gesture consistent with carrying a concealed weapon can give rise to a reasonable suspicion of illegal activity. See United States v. Ward, No. 98 CR. 1235 (AGS), 1999 WL 130653, at *2–3 (S.D.N.Y. Mar. 11, 1999) (individual's hand motion during consensual encounter with police, in which the individual reached behind his back, justified officer's grabbing of individual's hand and removal of a gun in his waistband); United States v. DeBerry, 76 F.3d 884, 885 (7th Cir. 1996) (suspect's "ambiguous gesture," which officer interpreted as a possible reach for concealed gun, justified *Terry* stop and patdown); United States v. Mayo, 361 F.3d 802, 803, 807 (4th Cir. 2004) (suspect's hand movement, suggesting to officers that he was concealing a "heavy" object in his coat pocket, was among the articulable factors justifying stop and frisk).

Here, Detective O'Brien candidly conceded that he had not seen any visible indication, such as a bulge, of the object in defendant's waistband. See Tr. at 36–37. However, he testified convincingly that defendant's hand gesture toward his waistband was a familiar one that he had seen numerous times in his experience as a police officer – that of someone adjusting a gun tucked into his pants. See id. at 10–11, 36–41. Det. O'Brien demonstrated the gesture twice during defendant's suppression hearing, each time depicting a distinctive gripping motion, as if holding and adjusting (first up and then down) something comparable in size,

10

shape, and heft to a handgun.  See id. at 9–10, 43–44.  He testified that he had seen such a motion in connection with eight to ten prior arrests, and that he was accustomed to seeing it performed by his fellow officers nearly every day.  See id. at 10.

The defense attempt to ascribe innocent explanations to defendant's hand gesture does not negate the reasonableness of the detective's suspicion.  In particular, defense counsel sought to establish at the suppression hearing that, for example, defendant could have been adjusting a cell phone attached to his belt, tucking in his shirt, or "adjusting his private parts . . . ."  See id. at 36–39, 61.  However, Det. O'Brien, while admitting that he could not be certain that defendant was carrying a gun, testified credibly that the gesture did not appear to conform with any reasonable alternative explanation, see id. at 36-37, 40–41, 43-44 -- a conclusion that was supported by his in-court demonstrations of his observation.  Moreover, there is no requirement that conduct be of an indisputably criminal nature in order to constitute an articulable fact supporting a lawful investigative detention.  See Trullo, 809 F.2d at 112 ("[T]he applicable standard in determining the propriety of a Terry stop is whether a defendant's acts give rise to an articulable, reasonable suspicion of criminal activity and not whether they can be construed as innocent through speculation.").  As the Supreme Court noted in Wardlow:

> Even in Terry, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation.  The officer observed two individuals pacing back and forth in front of a store, peering into the window and periodically conferring.  All of this conduct was by itself lawful, but it also suggested that the individuals were casing the store for a planned robbery.  Terry recognized that the officers could detain the individuals to resolve the ambiguity . . . .

> In allowing such detentions, *Terry* accepts the risk that officers
> may stop innocent people.

528 U.S. at 125–26 (internal citation omitted).

   5.   **Totality of the Circumstances**

"When evaluating the reasonableness of a *Terry* stop, the reviewing court must consider the totality of the circumstances surrounding the stop," viewing the facts "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." Bayless, 201 F.3d at 133.

Taken together, the foregoing factors support Det. O'Brien's reasonable suspicion. After dark in a neighborhood he knew to be a violent hub of illegal drug activity, Det. O'Brien observed a pair of men who seemed to be trailing another man along a deserted street into a dark, wooded area at the end of the road.  He then observed the three men emerge back onto the street together, whereupon defendant made a distinctive motion that in the detective's experience was consistent with the handling of a concealed handgun (and not with the innocuous adjustments posited by the defense).[4]  Based on these factors, Det. O'Brien suspected that the men had just completed or were about to complete a drug transaction, or that the pair of men had converged on the skinny man in order to rob him.  Under the totality of

---

[4] The case bears no resemblance to the facts in United States v. Parker, No. 99-CR-123 (JG), 1999 WL 997282 (E.D.N.Y. Oct. 18, 1999), on which defendant relies.  There the court concluded that the investigative stop was not justified by defendant's avoiding of eye contact with the officer, and his so-called "blading" (described in the opinion as "a practice by which gun-toters 'turn the body sideways' in an effort to evade detection of the weapon.").  See id. at *2, 6.  In Parker, unlike here, the area "was not a known drug or firearm location" and "no suspicious-looking activity had been observed . . . ." Id. at *7.

12

these circumstances, the Court finds that a "reasonable and cautious police officer" could have concluded that something was amiss, id., and that Det. O'Brien was justified in briefly detaining defendant and his companions for further investigation.

**B.     The Frisk**

The Court must next determine whether Det. O'Brien's decision to conduct a limited search for weapons was similarly supported by a reasonable suspicion that defendant posed a danger to the detective or others nearby. See Terry, 392 U.S. at 27, 29, 30. Under the Fourth Amendment, a police officer possesses a "narrowly drawn authority" to conduct "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Id. at 27. Moreover, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. For example, a suspicious bulge in the jacket of a lawfully detained individual is sufficient to justify a protective search, even in the absence of any other indicia that the individual poses a safety threat. See Pennsylvania v. Mimms, 434 U.S. 106, 111–12 (1977) (upholding admissibility of gun discovered in defendant's coat pursuant to protective search during routine traffic stop); see also United States v. Hamilton, 978 F.2d 783, 785 (2d Cir. 1992) ("unusual bulge" in suspect's pocket was sufficient to justify frisk of individual detained on suspicion of smuggling narcotics).

Similarly, a suspicious hand gesture, in addition to supporting the initial stop, can

13

justify a protective search for weapons. See Ward, 1999 WL 130653, at *3 (confronted with individual who reached behind his back while talking to police, officer was justified in grabbing individual's hand and seizing gun from his waistband); Rogers, 1996 WL 422260 at *5 (confronted with robbery suspect "who kept turning her left side away from him and at one point appeared to reach toward that side," officer made "entirely reasonable" decision to frisk suspect); DeBerry, 76 F.3d at 885 (defendant's "ominous-seeming" gesture entitled officer to stop and pat down defendant to determine whether he was carrying a gun); Mayo, 361 F.3d at 807–08 (defendant's gesture reasonably suggested to officers that defendant was carrying a gun, giving officers the right to pat him down).

Moreover, even absent any visible indicia of a concealed weapon, the nature of the suspected activity may reasonably lead the officer to conclude that the individual is armed, justifying a patdown. For example, in Terry, the defendant's actions "were consistent with [the officer's] hypothesis that these men were contemplating a . . . robbery -- which, it is reasonable to assume, would be likely to involve the use of weapons -- and nothing in their conduct . . . gave him sufficient reason to negate that hypothesis." 392 U.S. at 28 (upholding defendant's conviction for possession of a handgun recovered pursuant to protective search). Similarly, as the defense conceded, see Tr. at 51-52, the Second Circuit has held protective searches to be reasonable in connection with suspected drug activity. See Alexander, 907 F.2d at 273 ("[T]his Court has repeatedly acknowledged the dangerous nature of the drug trade and the genuine need of law enforcement agents to protect themselves from the deadly threat it may pose.").

In this case, Det. O'Brien reasonably believed that he might be observing an incipient robbery or drug deal, or perhaps even a robbery in progress. This alone would arguably suffice under Terry or Alexander to justify his protective search of defendant. See Terry, 392 U.S. at 28. Here, however, there are additional factors: the high-crime area of the detention, the time of night, and defendant's distinctive gesture suggesting to Det. O'Brien that defendant was carrying a gun. Under these circumstances, the Court concludes that "a reasonably prudent man would have been warranted in believing [defendant] was armed and thus presented a threat to the officer's safety while he was investigating his suspicious behavior." Terry, 392 U.S. at 28.

Finally, Det. O'Brien's search was proportional to the risk he perceived. He never drew his gun, and the frisk he performed, up to the point at which he felt defendant's revolver, was limited to a patdown of the outside of defendant's clothing. As such, the scope of the stop and search "was reasonably related to the circumstances which justified the stop in the first place," see Alexander, 907 F.2d at 272, and the search was therefore lawful.

## CONCLUSION

For the foregoing reasons, the Court recommends that defendant's motion be denied.

Any objection to the recommendations contained herein must be filed with the Honorable Nicholas G. Garaufis by March 16, 2007. Failure to file objections in a timely manner may waive a right to appeal the District Court order. See 28 U.S.C. § 636(b)(1); Fed.

R. Civ. P. 6(a), 6(e), 72; Small v. Sec'y of Health & Human Servs., 982 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to docket and serve this Report and Recommendation through the Electronic Case Filing System.

**SO ORDERED**

**Dated:** **Brooklyn, New York**
**March 2, 2007**

**ROANNE L. MANN**
**UNITED STATES MAGISTRATE JUDGE**